1 PARKER C. FOLSE, III
  EDGAR G. SARGENT
2 IAN B. CROSBY
  SUSMAN GODFREY, LLP
3 1201 Third Avenue
  Suite 3100
4 Seattle, Washington 98101
  (206) 516-3880 (tel.)
5 (206) 516-3883 (fax)

6 H. LEE GODFREY
  SUSMAN GODFREY, LLP
7 1000 Louisiana
  Suite 5100
8 Houston, Texas 77002
  (713) 651-9366 (tel.)
9 (713) 654-6666 (fax)

FILED IN THE
U.S. DISTRICT COURT
EASTERN DISTRICT OF WASHINGTON

SEP 21 2005

JAMES R. LARSEN, CLERK
_____ DEPUTY
SPOKANE, WASHINGTON

10            **UNITED STATES DISTRICT COURT**
               **EASTERN DISTRICT OF WASHINGTON**
11

| METROPOLITAN MORTGAGE & SECURITIES CO., INC. and SUMMIT SECURITIES, INC., | No. **CV-05-290-FVS** |
|---|---|
| v. | COMPLAINT FOR PROFESSIONAL NEGLIGENCE, NEGLIGENT MISREPRESENTATION, AND BREACH OF CONTRACT |
| PRICEWATERHOUSECOOPERS, LLP | BY PLAINTIFFS METROPOLITAN MORTGAGE & SECURITIES CO., INC. AND SUMMIT SECURITIES, INC. |

19      Plaintiffs Metropolitan Mortgage & Securities Co., Inc. ("Met"), and

20 Summit Securities, Inc. ("Summit"), bring this Complaint for damages against

21 Defendant PricewaterhouseCoopers, LLP ("PwC"), and allege on information and

22 belief as follows:

25 **ORIGINAL**

26 COMPLAINT – 1

**INTRODUCTION**

1.     This is a suit to hold PwC accountable for the immense financial consequences of its failure to perform its duties as independent auditor of Met and Summit. Through negligence and in breach of contract, PwC's dereliction in the performance of its audits and misrepresentations in its audit reports enabled and concealed a foreseeable and preventable chain of events that pushed Met and Summit deeply into bankruptcy.

2.     As independent auditor of Met and Summit, PwC issued unqualified audit reports for fiscal years 1999 and 2000, representing that PwC had planned and performed its audit to obtain reasonable assurances about whether Met's and Summit's financial statements were free of material misrepresentation.  PwC further represented that the companies' financial statements for those years conformed with applicable accounting principles and fairly presented the companies' financial condition.  All of these representations were false.

3.     The audits PwC conducted were not performed in accordance with accepted auditing standards or the duties that PwC owed Met and Summit.  Among other failings, the PwC audits failed to detect violations of applicable accounting principles and to disclose significant and material accounting departures and internal control deficiencies at Met, Summit, and their respective subsidiaries. Further, PwC manifested a lack of independence by selling a tax shelter to Met in which PwC had an interest at the time it was charged with auditing Met's accounting treatment of that same shelter.

COMPLAINT – 2

4.    PwC's negligence and breach of its contractual obligations concealed the true gravity of Met's and Summit's financial condition from certain independent directors, officers, and regulators who could and would have acted to prevent further deterioration had they known.   This gave C. Paul Sandifur ("Sandifur"), as Met's CEO and Chairman of the Board, and as controlling common shareholder of both Met and Summit, the latitude he needed to preserve his own position while prolonging the companies' lives past the point of insolvency and dissipating their assets.

## JURISDICTION AND VENUE

5.    This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1334(b) and (c) because it is a civil proceeding arising in or related to a case pending under Title 11 of the United States Code, namely the Chapter 11 bankruptcy proceedings filed by Met and Summit, administratively consolidated under case no. 04-00757-PCW11 pending in the United States Bankruptcy Court for the Eastern District of Washington.

6.    Venue is proper in this district pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to the claims herein occurred in the Eastern District of Washington.

## THE PARTIES

7.    Plaintiff Metropolitan Mortgage & Securities Co., Inc., is a Washington corporation that maintains its principal place of business in Spokane, Washington.   Met was incorporated on January 8, 1953.   Met is the direct and indirect owner of a number of subsidiaries that with Met constitute the

COMPLAINT – 3

Metropolitan Group.  Met's principal subsidiaries are Metwest Mortgage Services, Inc., a mortgage servicer; and Western United Holding Company ("WUHC"), a holding company that owns Western United Life Assurance Company ("WULA"), an insurance company in receivership.

8.    Plaintiff Summit Securities, Inc. is an Idaho corporation that maintains its principal place of business in Spokane, Washington.  Summit was incorporated on July 25, 1990.  The Summit Group consists of Summit itself, Summit's parent holding company National Summit Corp. ("National Summit"), and Summit's direct and indirect subsidiaries, principally comprising: Metropolitan Investment Securities, Inc. ("MIS"), a broker dealer; Summit Property Development, Inc., a real estate service provider; and Summit Group Holding Company, a holding company that owns Old Standard Life Insurance Company ("Old Standard"), an Idaho insurance company now in rehabilitation, and owner in turn of Old West Annuity and Life Insurance Company ("Old West"), an Arizona insurance company also now in rehabilitation.  The Summit Group and Metropolitan Group (collectively the "Met/Summit Group") are affiliated through ownership of controlling common shares of both Met and National Summit by Sandifur and related persons and entities.

9.    Defendant PricewaterhouseCoopers, LLP, is a Delaware limited liability partnership doing business in the State of Washington.  PwC maintains a place of business in Seattle, Washington.  PwC audited financial statements for Met and Summit for the fiscal years 1999 and 2000, and reviewed and reported on

Met's commercial real estate lending practices in 2001.  PwC resigned as auditor for Met and Summit on June 12, 2001.

## FACTS

**A.    The Met/Summit Group**

10.    Before its collapse and Chapter 11 filing in February 2004, Met was the oldest and largest debenture company in the State of Washington. Sandifur inherited control of the company from his father, who co-founded Met in 1953. Sandifur was Met's President, CEO, and Chairman of the Board until resigning after accounting irregularities were discovered.  Sandifur and his family directly and indirectly own all of Met's and Summit's common stock.

11.    Under Sandifur's control, Met and Summit raised capital and managed investments for all of the companies in the Met/Summit Group. Collectively, the Met/Summit Group once claimed more than $2 billion in managed assets.  Today, Met and Summit collectively face claims in bankruptcy exceeding $600 million.

12.    The Met/Summit Group took a crucial turn toward disaster in 2000, when it changed the focus of its investment activities from residential mortgages to commercial real estate lending.  This business strategy failed almost immediately. Inexperienced at underwriting these high-risk transactions, and operating with practically nonexistent controls, the Met/Summit Group approved and extended many inadequately collateralized loans to borrowers with little capacity for repayment.

13.    Met and Summit raised capital to fund these unsound investments by selling debt instruments and preferred stock carrying high rates of return. Unable to generate sufficient cash flow from its non-earning commercial real-estate investments to pay these returns, the Met/Summit Group increasingly used money from newly issued securities to pay existing obligations.

14.    Sandifur could secure the assent of Met's and Summit's directors to his reckless program, and Met and Summit could attract investors for new debt and stave off regulators who would have prevented that debt's issuance, because Met's and Summit's financial statements hid the true extent of their underlying weakness. Certain independent board members, investors, and regulators trusted those financial statements because they had been certified by PwC.

**B.    PwC's Misleading Audit Reports**

15.    In its reports for Met's 1999 and 2000 fiscal years, PwC stated its opinion that Met's financial statements "present fairly, in all material respects, the financial position of Metropolitan Mortgage & Securities Co., Inc. and its subsidiaries" at the end of each fiscal year, "and the results of their operations and their cash flows for each of the three years in the period ended [each year] in conformity with generally accepted accounting principles."

16.    In each report, PwC further represented: "We conducted our audits of these statements in accordance with auditing standards generally accepted in the United States of America, which require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement."

COMPLAINT – 6

17.    PwC resigned as Met's and Summit's auditor before the end of their 2001 fiscal year.  But PwC reiterated its prior reports on 1999 and 2000 in conjunction with Met's subsequent financial statements for 2001 and 2002, which included historical results for the preceding two years.  PwC also issued substantially identical unqualified audit reports respecting Summit's financial statements for 1999 and 2000, and reiterated those reports in the same manner in conjunction with Summit's financial statements for 2001 and 2002.

18.    In each case, the opinions and representations stated in PwC's reports on Met's and Summit's 1999 and 2000 financial statements were incorrect.  Those financial statements did not, in fact, present fairly, in all material respects, the financial positions of the companies in accordance with generally accepted accounting principles ("GAAP").  Nor had PwC conducted its audits of those statements in accordance with generally accepted auditing standards ("GAAS").

### 1.  Failure of Financial Statements to Conform to GAAP

19.    GAAP are the body of standards accepted by the accounting profession for the form, preparation, and content of financial statements.  GAAP include both broad guidance and detailed rules meant to ensure that financial statements accurately reflect a company's financial condition and performance.

20.    The preparation and presentation of Met's and Summit's audited financial statements for 1999 and 2000 violated numerous GAAP standards.  These include standards concerning recognizing gains on related party transactions, reporting gains on commercial real estate transactions, recognizing

COMPLAINT – 7

loan fees and interest income, and relying on overly optimistic appraisals in valuing real estate in assessing the carrying value of assets.

### a) Example: The Koa Timber Transaction

21.    Met's accounting in 2000 for the sale to Summit of a note purportedly collateralized by rights to harvest Koa timber in Hawaii exemplifies many of these GAAP violations. The contract was one of three related transactions by which various Metropolitan Group entities advanced funds to the holder of an option to purchase a Koa forest for $10 million. Summit subsidiary Old Standard Life Insurance Co. provided a $6 million first mortgage on the property, and Summit itself provided a $3.5 million second. Met advanced an additional $2.5 million in exchange for a note that, though denominated a "Timber Harvesting Agreement," required the obligor to repay $18 million to Met over five years whether he harvested any timber or not.

22.    In fact, the obligor had no permits from the State of Hawaii to harvest any of the timber, and no other means to repay the note or the mortgages. Nevertheless, just before its fiscal year-end, Met sold the Timber Harvesting Agreement to Summit for its full discounted face value of $13.2 million. Met booked the entire $10.7 million "gain" ($13.2 million less its $2.5 million basis) on the transaction into current income, while Summit capitalized the purchase price and recorded the receivable at that value on its balance sheet.

23.    Both Met's and Summit's 2000 audited financial statements reported that the purchase price was the "estimated fair value" of the Timber Harvesting Agreement receivable, and that the receivable was "collateralized by timber rights

COMPLAINT – 8

in Hawaii."  Neither of these statements was true.  At the time of the sale to Summit, the obligor had still not obtained any permits to harvest the timber, and had no foreseeable prospects of doing so.  And in fact, shortly after the sale closed, but well before PwC completed its audits of Met's and Summit's financial statements, the obligor defaulted and sued Met over the transaction.  Furthermore, the obligor did not have the financial capacity to repay the loans in question.  PwC knew or should have known all these facts.

24.    The improper accounting for this related-party transaction had a profound effect on Met's reported financial performance.  The $10.7 million "gain" reported from the inflated sale of the Timber Harvesting Agreement to Summit went straight to Met's pre-tax income.

25.    Meanwhile, the transaction had no material effect on Summit's income statement.  Because Summit capitalized the cost of acquiring the Timber Harvesting Agreement shortly before the end of the year, its income statement reflected only a trivial amount of that cost's amortization.  And because Summit did not write down the value of the Timber Harvesting Agreement when the obligor defaulted, Summit was able to overstate its balance sheet and avoid recognizing an impairment of its investment in the timber harvesting agreement.

26.    In total, this improper accounting for this single transaction allowed Met to over-report its pre-tax income by the entire $10.7 million "gain" it booked on the sale to Summit, cutting Met's reported net loss for the year by nearly 50%, from $22.4 million to just $11.7 million, with no discernable effect on Summit's reported performance.

COMPLAINT – 9

**b) Example: The FLIP Tax Shelter**

27.    In 1998, the Met/Summit Group implemented a foreign leveraged investment program ("FLIP") tax shelter at PwC's recommendation.  The intent of the FLIP was to simultaneously create the possibility of an economic gain and an income tax loss for Met and WULA. Through a complicated web of transactions involving offshore corporations and options on stock in foreign banks, the FLIP created paper losses of nearly $80 million for actual out of pocket costs of less than $10 million, generating tax benefits of approximately $28 million.

28.    PwC advised the Met/Summit Group that there was at least a 50% chance that the IRS would allow the FLIP tax shelter and recommended that Met realize 50% of the benefit of the shelter in Met's financial statements while only taking a reserve of 50% against the possibility that the shelter could be entirely disallowed.    PwC then purported to audit its own recommendations.    PwC participated in fees for its role in the FLIP transaction in addition to its audit fees. As a result of PwC's recommendend treatment of the FLIP, claimed tax benefits alone inflated Met's 1999 net income by more than 300%, from about $4 million to over $16 million dollars.

29.    PwC's advice regarding the validity of the FLIP tax shelter was erroneous.    Subsequently, the IRS determined that the FLIP was an abusive tax shelter and lacked economic substance. Ultimately, the IRS disallowed most of the benefits claimed from the shelter.

### 2. Failure by PwC to Follow Generally Accepted Auditing Standards

30.    PwC incorrectly opined that Met's and Summit's financial statements conformed with GAAP because it negligently failed to conduct its audit according to GAAS.   GAAS consist of guidelines issued by the American Institute of Certified Public Accountants that establish both the general standards of professionalism for auditors and the standards of field work by which they must conduct their audits.

31.    PwC's audits of Met's and Summit's financial statements in 1999 and 2000 violated GAAS in multiple respects.   These violations include failure to observe standards of professionalism through a lack of independence and a lack of due care, and failure to observe standards of field work through improper planning and supervision of the audit, inadequate understanding of internal controls, and failure to gather sufficient competent evidential matter to render an opinion on the companies' financial statements.

### a) Violation of Standards of Professionalism

32.    PwC's independence was compromised throughout its engagement by the dependence of its Spokane office on the Met/Summit Group's continued business.   One way in which PwC manifested its lack of independence was in proposing transactions in which PwC had an interest at the same time it was charged with auditing Met's and Summit's accounting treatment of those same transactions.

33.    PwC fatally compromised its independence through its involvement in proposing the FLIP tax shelter, participating in fees for its implementation,

COMPLAINT – 11

1    recommending a particular treatment of the shelter on Met's books in 1999, and

2    auditing its own recommendation.

3        34.    PwC underscored its lack of independence again in 2001 when, while

4    still auditor for Met and Summit, it offered to broker a sale of the Koa timber

5    assets that it had allowed Met to use to record a gain the previous year.

6        35.    PwC's lack of care in performing its audits manifested in many

7    failures.    PwC failed, for example, to detect and adequately communicate

8    reportable conditions, such as lack of internal controls, extensive non-earning

9    assets, and weak underwriting and appraisal practices.    PwC failed to identify

10   widespread overstatement of assets and the extensive use of related-party

11   transactions to record paper gains that lacked economic substance.

12                    **b) Violations of Standards of Field Work**

13       36.    PwC also failed to take into account numerous "red flags" when

14   planning and supervising its audits.    These included pervasive use of interest

15   reserves and recourse to collateral to keep receivables current, frequent use of

16   intercompany transactions to create accounting gains that lacked economic

17   substance, extraordinarily high leverage, default on a line of credit, negative cash

18   flow from operations, regular overrides by Sandifur of internal controls, and

19   dependence on unusual transactions with high-risk customers to generate returns.

20   PwC knew of all these alarming conditions, yet failed to design and conduct its

21   audits to address them.

22       37.    PwC's inadequate understanding of the Met/Summit Group's internal

24   controls prevented it from appreciating that those internal controls were grossly

25

26   COMPLAINT – 12

deficient, and caused it to ignore the danger evident in management's frequent overrides of financial processes.   Instead of demanding adequate documentary support, PwC over-relied on management representations and the work of inadequately trained client personnel.

38.   PwC's failure to gather sufficient competent evidential matter to justify its opinions contributed to its failure to ascertain misstatements of the companies' operations and financial condition.   These included overstatement of assets, masking of joint ventures as lending transactions, and booking large, year-end inter-company transactions that lacked economic substance but created the illusion of earnings.

## C.   PwC's Review of Commercial Real Estate Lending Process

39.   PwC also failed to accurately report on the condition of the Met/Summit Group's commercial real estate lending processes when Met engaged PwC to do so in February 2001.   PwC's report stated:

> The organization's control environment contains many strengths in regards to the commercial real estate (CRE) lending process.   The company serves a nice market for CRE lending that has proven profitable.   The organization has creative, innovative personnel who possess significant depth of experience in the organization's niche business.   The lending process includes a review of all loans by an Underwriting Committee to insure against originating loans with inappropriate risk.   The approach to pricing of loans and the loan-to-value ratios typically required to secure commercial property appear to be commensurate with risk.

40.   This assessment of the Met/Summit Group's CRE lending practices was false and misleading in practically every respect.   The Met/Summit Group's

COMPLAINT – 13

control environment for CRE lending was in fact fundamentally flawed. Its activities in the CRE lending market were not in fact profitable. Overall, its personnel were inexperienced and out of their depth in that market. Review of transactions by the Underwriting Committee was a meaningless rubber stamp that placed no check on making inappropriately risky loans. And rampantly inflated appraisals resulted in wildly overstated loan-to-value ratios and systematically undersecured loans.

41.    PwC knew or should have known at the time it rendered its report that all of its statements about the strengths of the Met/Summit Group's CRE lending practices were false and misleading. Indeed, its report acknowledged many of the crucial weaknesses in those practices while at the same time radically understating their severity.

42.    Had PwC accurately reported on the state of the Met/Summit Group's CRE lending practices, it would have portrayed them as an unmitigated disaster and an immediate threat to the continued viability of the Met/Summit Group. In recognition of this knowledge, PwC should have identified the state of the Met/Summit Group's CRE lending practices as a material weakness in the companies' internal controls and re-evaluated its previously-expressed opinions on the accuracy of Met's and Summit's financial statements in light of that weakness.

**D.    Impact of PwC's Dereliction on the Met/Summit Group**

43.    Had PwC conducted its audits and expressed its opinions in accordance with GAAS, it could not have stated and reaffirmed its unqualified opinions on Met's and Summit's 1999 and 2000 financial statements as presented.

PwC's lack of independence alone precluded PwC from rendering any opinion on those financial statements. An independent auditor would have required Met and Summit to issue accurate financial statements disclosing the true severity of their condition, and if they refused to do so, issued a qualified opinion, disclaimed any opinion, or resigned the engagement. Any of these actions would have precipitated responses from certain directors, investors, and regulators that would have prevented the disastrous piling on of debt and dissipation of assets that marked the artificially prolonged existence of the Met/Summit Group under Sandifur.

### 1. State Securities Regulators

44.    One likely regulatory intervention would have come from the Washington Department of Financial Institutions ("DFI"). Prior to 2000, the DFI had overseen Met's securities issuing activities. The DFI had a long history of regulating Met, and was very familiar with Met's business. The DFI also had at its disposal the highly specific regulatory framework of the Washington Debenture Act. The Debenture Act was an especially effective tool for regulating Met, because issues particular to Met, as the largest and oldest debenture company in the state, have driven much of the development of the Act.

45.    Regulatory intervention by the DFI had saved the Met/Summit Group before. In 1995, when an investigation identified questions about the ability of Met to pay returns on its investments and its compliance with the Washington Debenture Act, the DFI had imposed special reporting requirements and placed a cap on the company's total amount of outstanding debentures and preferred stock. In 1996, the DFI entered into a Memorandum of Understanding ("MoU") with Met

COMPLAINT – 15

that required DFI approval prior to making large loans to or asset transfers between its affiliates, and prohibited payment of dividends to common shareholders. Met was also required to provide a long-term strategic plan to end Debenture Act violations and cease unsound business practices. The MoU further continued and enhanced the restrictions on Met's sales of securities imposed in 1995.

46.    These measures were highly effective. After the DFI imposed them, results from the Met/Summit Group's operations improved, profitability increased, and the companies began to demonstrate an ability to pay their obligations.

47.    In 1998, however, Met began violating the terms of the MoU by issuing dividends to common shareholders—primarily members of the Sandifur family—and aggressively growing assets in contravention of its strategic plan. Again, the DFI investigated the company. This investigation found renewed violations of the Debenture Act, and concluded that the company was engaging in excessive risk-taking for the benefit of Met's common stockholders at the expense of holders of its preferred stock and debentures and the company as a whole. PwC was charged with determining Met's compliance with applicable regulatory requirements, but Met's financial statements made no mention of Met's noncompliance with the Debenture Act or the MoU.

48.    The DFI found that Met's capital structure encouraged such risk-taking. Met raised nearly all of its capital through sales of debentures and preferred stock. Although classified as equities for accounting purposes, Met's preferred stock had in substance the character of variable-rate debt instruments. All right to participate in the company's profits belonged instead to the company's

small number of common shareholders.  Because the common shareholders had very little capital at risk, they had much to gain and little to lose from high-risk activities.  The same was true of Summit.

49.    To improve the soundness of the company and restore compliance with the Debenture Act, the DFI sought to impose further conditions aimed at restraining growth in outstanding debentures and preferred stock, ensuring capacity to pay debt, and preserving equity capital.  Met would never comply with these conditions.    As much as the DFI's restrictions would have benefited the Met/Summit Group, they were onerous to Sandifur as the companies' predominant common shareholder.  To avoid them, Sandifur contrived to preempt the DFI from regulating Met by depriving it of jurisdiction to do so.

50.    The conditions that the DFI sought to impose on Met's business were attached to Met's permits to sell securities under Washington State law.  Met could ignore those conditions so long as it did not sell securities subject to application of Washington State law.  Federal law preempts application of state law to the sale of securities on a federally covered exchange.  So Sandifur sought to deprive the DFI of authority over Met's business by raising new money solely through sales of federally covered securities.

51.    To succeed, Sandifur first needed to list Met securities on a federally covered exchange.  He obtained such a listing for Met debentures on the Pacific Stock Exchange in January 2000, and in January 2002 secured a listing on the American Exchange for preferred stock.  Met could acquire and maintain these federally covered listings only because its audited financial statements for fiscal

COMPLAINT – 17

1999 and 2000 showed that its financial condition met applicable exchange listing criteria. Had PwC taken the actions that a GAAS audit would have required of it in 1999 and 2000, it is unlikely that Met would have been able to acquire or maintain its listings on federally covered exchanges.

52.     Without federally covered listings, Met would have been required to comply with the conditions that the DFI intended to impose upon it, as well as subject itself to the DFI's continued close regulatory scrutiny. If this had occurred, the Met/Summit Group would not have continued to dissipate assets through its risky and poorly executed business strategy, and it would not have incurred massive additional debt and preferred stock dividend obligations that it could not pay.

### 2. State Insurance Regulators

53.     At the same time that Sandifur was seeking to free Met from the oversight of the DFI, Met's largest indirect insurance subsidiary, WULA, was subject to regulation and periodic examination by Washington's Office of the Insurance Commissioner ("OIC"). In December 1999, the OIC completed an examination of WULA that revealed numerous violations of insurance laws, including improper intercompany transactions with Met and inadequate substantiation of asset values. Again, PwC did not detect or require Met to report these violations.

54.     For example, the OIC found "weakness in . . . intercompany transactions and operations as well as inadequate documentation of intercompany transactions as support for financial records." "In some instances," the OIC found,

COMPLAINT – 18

"balances could not be substantiated by our audit or by [WULA]." It found that WULA "was not able to reconstruct several intercompany transactions due to personnel changes and lack of formalized procedures." This raised "significant concerns as to overall control and oversight of intercompany transactions."

55. Lack of documentation similarly affected valuation of assets. For example, the OIC found that WULA improperly held substantial investment real estate at book value without having obtained appraisals at the time of purchase. WULA was also found to hold numerous loans in excess of statutory maximum loan to value ratios. And Met was found to have improperly used an intercompany payable account as a short-term line of credit.

56. The OIC acknowledged that apparent accuracy of WULA's financial reporting "could not be reasonably verified," but noted that PwC had issued an unqualified opinion on WULA's 1999 financial statements. The OIC issued a number of detailed instructions to WULA to remedy the company's violations, and continued portions of its examination into 2000.

57. Had PwC taken the actions that a GAAS audit would have required in 1999 or 2000, it would have been obliged to note WULA's noncompliance with insurance regulations and OIC instructions, and the OIC likely would have imposed more stringent conditions on WULA, or recognized that the conditions it had imposed were not being adhered to. This would likely have resulted in intervention by the OIC in WULA that would have deprived Sandifur of an essential component for concealing the financial performance of the Met/Summit Group, prolonging its corporate existence, and dissipating its assets.

COMPLAINT – 19

### 3. Insiders and Investors

58.    Had PwC taken the actions that a GAAS audit would have required in 1999 or 2000, it would likely also have made Met's and Summit's securities unmarketable to investors.    This would have prevented Met and Summit from continuing to raise unserviceable debt.

59.    A GAAS audit would also have prompted PwC to report the many detrimental conditions, financial misstatements, and unsound practices it should have discovered to independent members of Met's and Summit's boards and audit committees.    The revelation of pervasive accounting problems to the board would likely have resulted in Sandifur's departure many years earlier than it ultimately occurred.

## COUNT I:
## NEGLIGENCE

60.    The allegations of the foregoing paragraphs 1 through 59 above are incorporated herein by reference.

61.    PwC owed a duty to Met and Summit to perform its audits according to the standards, and with the degree of care, that generally prevailed in the accounting profession during the period covered by the respective audits.

62.    PwC knew or should have known that, among others, Met, Summit, securities regulators, and securities exchanges, would rely upon the information set forth in Met's and Summit's audited financial statements.

63.    The auditing services rendered by PwC in connection with its audits of Met and Summit were performed negligently and carelessly because, as detailed above, they:  (i) failed to conform with GAAS;  (ii) were not performed with the

COMPLAINT – 20

degree of skill and care commonly applied by and expected from other accounting firms under similar circumstances;  (iii) were not performed with the degree of skill and care that PwC held itself out as possessing; and (iv) were not performed with the degree of skill and care called for by PwC's own internal policies and procedures.

64.    PwC's negligence includes, but is not limited to:  (i) its failure to gather sufficient competent evidential matter to justify its opinions;  (ii) the manner in which it conducted its audits and its reviews of the consolidated financial statements and other information for Met and Summit;  (iii) its failure to report known and significant internal control deficiencies or to raise those issues to the level of a reportable condition and material weakness;  (iii) the opinions given and approval provided allowing Met and/or Summit to over-report income or to under-report losses resulting from numerous transactions;  (iv) its misrepresentation that it had conducted its audits in accordance with GAAS and that the financial statements it audited were fairly presented in all material respects in accordance with GAAP.

65.    As a direct and proximate result of PwC's negligence, Met and Summit have suffered and continue to suffer substantial harm and are entitled to recover from PwC damages in an amount to be proven at trial.

## COUNT II:
## NEGLIGENT MISPREPRESENTATION

66.    The allegations of the foregoing paragraphs 1 through 65 above are incorporated herein by reference.

COMPLAINT – 21

67.    For the fiscal years 1999 and 2000, PwC issued audit reports to the audit committees of Met and Summit.  In all cases, PwC issued unqualified audit reports in which PwC made the following material misrepresentations, among others:  (i) that it had audited the financial statements of Met and Summit in accordance with GAAS;   (ii) that as part of its audit, PwC obtained an understanding of internal controls sufficient to plan its audit and to determine the nature, timing, and extent of testing performed;   (iii) that it had planned and performed those audits to obtain reasonable assurance about whether the financial statements were free of material misstatements;   (iv) that its audits provided a reasonable basis for its opinions.  In February 2001, PwC also delivered a report to Met that falsely portrayed Met's commercial real estate lending practices as basically sound and profitable.

68.    At the time that PwC issued its audit reports and its commercial real estate review report, PwC knew or should have known that the above material misrepresentations were false, and/or PwC negligently disregarded whether these representations were true.  PwC nevertheless issued the reports containing these negligent material misrepresentations with full knowledge and intention that they would be relied upon by Met and Summit.

69.    At all relevant times there were independent directors and officers of Met and Summit who reasonably relied on PwC's material misrepresentations in discharging their duties, and who, if PwC had not negligently misrepresented the facts, would have taken action designed to avoid the damages that Met and Summit seek to recover.

COMPLAINT – 22

70.   As a direct and proximate result of PwC's negligent misrepresentations, Met and Summit have suffered and continue to suffer substantial harm and are entitled to recover from PwC damages in an amount to be proven at trial.

## COUNT III:
## BREACH OF CONTRACT

71.   The allegations of the foregoing paragraphs 1 through 70 above are incorporated herein by reference.

72.   For the relevant fiscal years 1999 and 2000, PwC entered into agreements with Met and Summit to render professional services on behalf of the companies comprising Metropolitan Group, including, without limitation, to audit Metropolitan Group's consolidated financial statements.

73.   Pursuant to those agreements, PwC specifically promised to, among other obligations:

74.   Perform the audit in accordance with auditing standards generally accepted in the United States, which required that PwC plan and perform the audit to obtain reasonable assurance about whether the financial statements were free of material misstatement;

75.   Examine evidence supporting the amounts and disclosures in the financial statements, assess accounting principles used and significant estimates made by management, and evaluate the overall financial statement presentation;

COMPLAINT – 23

76.    Consider internal control over financial reporting to determine the nature, timing and extent of auditing procedures necessary for expressing an opinion on the financial statements;

77.    Design the audit to obtain reasonable assurance of detecting errors or fraud that would have a material effect on the financial statements as well as other illegal acts having a direct and material effect on financial statement amounts; and

78.    Communicate to the board of directors (i) any significant deficiencies identified during the audit relating to internal control over financial reporting and (ii) any illegal act, material errors, or evidence identified during the audit that fraud may have existed.

79.    PwC breached its agreements with the Met/Summit Group by failing to perform its professional services in the agreed upon manner.  Among other breaches, PwC failed to perform its audit of Metropolitan Group in accordance with GAAP, failed to consider lack of internal controls over financial reporting, failed to design the audit to obtain reasonable assurance of detecting material errors, fraud, or other illegal acts, and failed to communicate to the board of directors significant issues with internal controls or evidence of material errors, fraud, or other illegal acts identified during the audit.

80.    As a direct and proximate result of PwC's breach of its agreements, Met and Summit have suffered and continue to suffer substantial harm and are entitled to recover from PwC damages in an amount to be proven at trial.

COMPLAINT – 24

1 **PRAYER**

2      81.   WHEREFORE, Plaintiffs pray for judgment against the defendant as

3 follows:

4     i.     For damages according to proof to be determined at trial;

5     ii.    For interest according to law;

6     iii.   For reasonable attorneys' fees;

7     iv.   For costs of suit; and

8     v.    For such other and further relief as the Court may deem just and

9 proper.

10 DATED this 21st day of September 2005.

11                   SUSMAN GODFREY, LLP

12

13                   Parker C. Folse, III
                    WSBA No. 24895

14                   Edgar G. Sargent
                    WSBA No. 28283

15                   Ian B. Crosby
                    WSBA No. 28461

16                   1201 Third Avenue
                  Suite 3100

17                   Seattle, Washington 98101
                  (206) 516-3861 (tel.)

18                   (206) 516-3883 (fax)

19                   H. Lee Godfrey
                    Texas Bar No. 08054000

20                     (Pro Hac Vice Application Pending)
                  1000 Louisiana

21                   Suite 5100
                  Houston, Texas 77002

22                   (713) 651-9366 (tel.)
                  (713) 654-6666 (fax)

24

25

26 COMPLAINT – 25